### 158.  OHLEN *v.* ATLANTA & WEST POINT RAILROAD CO.

1. A common carrier, sued on its common-law liability for loss or injury of goods received by it for transportation, may relieve itself of liability by showing that the goods were damaged before it received them.  Where it does not appear either that the carrier received the goods as in bad order or that they were in fact in bad order when received, the presumption is that they were in good order, and the burden of proof is upon such carrier to show that it was free from negligence, and that its negligence did not cause or contribute to the damage.

2. Where there was evidence of the delivery by the carrier, in a damaged condition, of an entire shipment, and that the goods were originally shipped in good condition, and evidence as to the amount of damage, authorizing the recovery of a larger amount as damages on the entire shipment, it was error to direct a verdict for only a portion of the damaged goods, as to which the defendant conceded liability.

Action for damages, from city court of Atlanta—Judge Reid. November 27, 1906.

Argued February 26,—Decided July 18, 1907.

*Moore & Pomeroy,* for plaintiff.

*Dorsey, Brewster, Howell & Heyman,* for defendant.

RUSSELL, J.  Ohlen filed suit in the city court of Atlanta against the Atlanta & West Point Railroad Company, to recover for damage to 109 kegs of fish shipped from St. Andrews, Florida, to Atlanta, Georgia.  This suit is based upon two counts: first, the statutory action against the last of the connecting lines of carriers; and secondly, the common-law liability.  The plaintiff insisted only upon the common-law count; and hence the count based on section 2298 of the Civil Code will not be considered.  The court directed a verdict for $8 in favor of the plaintiff.  The plaintiff excepted, and brings the case to this court for review.  There are two assignments of error.  The first assigns error upon the overruling of plaintiff's objection to a freight bill "dated May 4, bearing the name of F. H. Allen, covering car 9077, 109¼ kegs of fish, marked weight 8750 pounds, with $51.20 freight, marked

paid on May 14, 1904, and bearing the signature of S. C. Magill, agent;" the objection made by the plaintiff being, that the evidence was immaterial, irrelevant, and illegal, and that it was an admission by the defendant in its own favor. The second assignment of error excepts to the ruling of the court in directing the verdict, over the plaintiff's objection. We shall consider the second assignment first, because the principles involved are controlling in the case. While the verdict was directed for the plaintiff, it was, in effect, a verdict directed for the defendant; because the defendant conceded that one keg was lost, and one keg so damaged as to be worthless, and tendered $8 and court costs in court.

So far as insisted on by the plaintiff, the petition alleged, that on or about the last day of April, 1904, he bought and had shipped to him from St. Andrews, Florida, to Atlanta, Georgia, 109 quarter kegs of fish, which were delivered to him by the defendant in Atlanta on or about May 14, 1904; that when shipped, the fish were in good order, and not in a damaged condition, but when delivered they were decayed, unmerchantable, and in a badly damaged condition, and that a portion of the fish (one-fourth keg) was never delivered. He charged, that the time consumed in conveying the fish was unreasonable and unnecessary, and that this fact contributed in a measure to their damage; that this shipment of fish should have arrived in Atlanta on or about May 4, 1904, and that the defendant wrongfully and negligently held and refused to deliver the shipment until on or about May 14, 1904; which fact, he charged, contributed to their damage.

The evidence for the plaintiff showed, that one Ponder, as his broker, received the bill of lading from him and sold the fish to J. J. & J. E. Maddox while they were in transit. When the bill of lading arrived, about the first of May, Ponder telephoned to the office of the defendant company at Atlanta and inquired for the fish, and was told that they were not there. He then called on the cashier at the office of the Atlanta & West Point Railroad, about a week after he received the bill of lading, and was told that the fish were not there. Two or three days later he again made inquiry and was told that they had not arrived. He then went into the depot and made a personal search and found the fish, marked "F. X. Ohlen." This was between the 8th and 10th of May. After the fish were found, they were not delivered until

the 14th of May; for the reason that the defendant company insisted on collecting a larger amount of freight than that called for in the bill of lading. The fish were sold to Maddox at $3.25 per keg, though the market price was more than that. After the fish were delivered to Maddox it was discovered that they were rotten and of no value. Maddox refused to pay for them, and tendered them back. The tender was waived because it was apparent that the fish were worthless. This witness further testified that a shipment of fish from St. Andrews, Florida, should reach Atlanta within three or four days after shipment. It further appeared in the evidence that permitting fish of the character in question to sit in a hot warehouse for a number of days would cause them to decay. It appeared, from the testimony of Mr. Maddox, that there was no brine in the kegs when they were opened. He also noticed Ohlen's name on them, and could not say they were only marked with the initials "F. X. O." He also testified that the market value of the fish between the 1st and 15th of May was $5 a keg. The agreed price was $3.25 a keg.

Under a notice to the defendant the bill of lading was produced and introduced in evidence for the plaintiff, as follows: "Pensacola, St. Andrews and Gulf Steamship Co. Consignee's receipt. Original. Received in apparent good order from H. W. Steinholser of date April 29, 1904, at St. Andrews, Fla., consigned to F. X. Ohlen, Atlanta, Ga., marked F. X. O., 104¼ kegs fish. Rate 63c per hundred pounds. Weight 8750. [Signed] C. Wishenburg, Agt." (Endorsed) "Deliver to bearer, May 5, 1904. Frank X. Ohlen." Plaintiff also introduced a letter from Ponder to Magill, agent of the Atlanta & West Point Railroad, as follows: "We hold B/L for 109 packages salt fish, which from marks on package we found out arrived here on 4th inst. We inquired at the depot in person once or twice, and over the phone, if goods had arrived, and were informed in the negative. On the 10th inst., we searched for the goods through your depot and found them there. Rate of freight on B/L is endorsed 63c per cwt., and we have in our possession letter from E. R. Cobb, G. F. A. of Pensacola, St. Andrews & Gulf Steamship Co., who issued B/L giving rate from Cromston, Fla., to Atlanta, Ga. of 63c. We have been refused delivery of the shipment unless freight charges in full, which is more than 63c per cwt., be paid. Weather is

getting hot and fish are being damaged every day they set in warehouse, and this is to put you on notice that we shall demand of your road damages, whatever they might be, and if the freight charges are not adjusted at once we will reject the shipment entirely and bring suit for amount of shipment." Also letter from S. E. Magill, agent, to C. B. Ponder Company, of May 14, 1904, as follows: "Confirming my telephone message to your bookkeeper this a. m., this is to notify you that we are ready to protect rate of 63c per cwt. on salt fish from St. Andrews, Fla., to Atlanta, Ga. Will you kindly send down and get shipment, which is at our depot?" According to the testimony, the fish were put up in brine, in little quarter barrels with wooden hoops around them. They were put up to keep, and in cool weather ought to keep sixty or ninety days. "They would go to pieces quicker if stored in a warm place for any length of time." It was also in evidence that, so far as general appearance was concerned, the kegs were apparently in good condition. And the testimony showed that if there was a leakage, it would make the kegs lighter; though there was no evidence that the kegs were weighed before delivered.

In our opinion the exception to the verdict directed by the court is well taken. Considered by itself, the testimony in behalf of the plaintiff entitled him to a recovery for the market value of the entire shipment of 109 kegs; and considered in connection with the testimony for the defendant, the most that can be said is that an issue of fact was presented, which should have been submitted to the jury. We apprehend that our learned brother of the trial bench was controlled in his decision by the ruling announced in *Evans* v. *A. & W. P. R. Co.*, 56 *Ga.* 502, in which it was held that a receipt for corn as in apparent good order, given by an agent of a steamboat, which corn was to be carried by water to Memphis and thence by rail to LaGrange, furnished no evidence that the defendant received the corn in good order, or apparent good order, or as in good order. In our judgment the decision above cited has no application whatever to the case at bar, although there is a similarity as to the facts. In the *Evans* case it appears that the action was based upon §2084 of the code, now §2298, and the decision is based entirely upon a strict construction of that statute, Judge Jackson, in rendering the opinion, say-

ing, "Our statute, §2084 of the code, makes the last company of connecting *railroads* liable; it is silent in respect to any connection with steamboats." But even in that case it was held that if it had been proved that any of the connecting railroads received the corn in good order, or as in good order, "then the presumption would have arisen that the corn remained in that condition of good order from connecting road to connecting road until it reached defendant, and hence that it was received by plaintiff as in the good order in which it left the other road, and such presumptive proof would have been sufficient to carry the case to the jury, and, unless rebutted, to have authorized a recovery from the defendant. Such seem to be the authorities; and principle and practical good sense and the convenience of the public sustain them. But this case breaks down from the fact that there is no positive proof that the defendant received this corn in good order or as in good order, and no presumptive proof thereof by proof that *any road* with which it connected so received the corn, *nor any proof that it received the corn from any other carrier."* Under the evidence submitted by the defendant in the form of the freight receipt, had the plaintiff insisted on his statutory remedy under the Civil Code, §2298, his case would not have broken down, as Judge Jackson termed it, for lack of proof that a road with which it connected received the fish in good order, or that it received the fish from another carrier. It must be borne in mind, however, that the statutory action predicated on §2298 was expressly abandoned by the plaintiff. Perhaps it was abandoned on account of the decision in the *Evans* case; but in any event, as that case was brought under the provisions embodied in §2298 (which was formerly §2084 of the code), the ruling in the *Evans* case is not in point.

Where the action is based on the common-law right of action, the carrier is bound, if he receives goods in good order, to deliver them in good order, whether there be a bill of lading or no bill of lading, a connecting carrier or no connecting carrier. The general rule as to the common carrier's liability for goods in his possession as carrier (and regardless of contractual exceptions) is that the carrier is liable for all loss or destruction of or injury to such goods, not occasioned by the act of God or the public enemy. Therefore, where the loss is not due to the excepted

causes, proof of negligence is immaterial, and the carrier can not escape liability by proving reasonable care and diligence. Under the common law the carrier is absolutely liable to deliver the goods in the condition in which it receives them, with only the exception stated in the rule above. This general rule is stated and illustrated by Judge Nisbet in the early case of *Fish* v. *Chapman,* 2 *Ga.* 349. In the more recent development of the rules of the carrier's liability, it has been held that he is not liable for loss or damage due to the intrinsic qualities of the goods carried. But this exception is not included in the exception made for the "act of God" in the common-law rule. The act of God, as expressive of a cause of loss or damage, means a casualty not due to human agency,—not only not due to it, but one which is no way contributed to by human agency.

With the rule of common-law liability settled, it is clear that the question of fact in this case is, what was the condition of the fish at the time the defendant received the kegs containing them? The evidence is undisputed that the fish were received in a damaged and worthless condition from the defendant. By this proof the plaintiff established the fact that he had not contributed to the injury, and shifted to the defendant the burden of showing responsibility for the bad condition of the fish to be chargeable to some one else, either a connecting carrier or the shipper, where it was shown that the goods were recently in good condition. The carrier had the right to refuse the shipment when tendered to him, whether by the original shipper or by a connecting carrier, if in bad condition; to inform himself of the condition and nature of the goods before receiving them for shipment; and he had the best opportunity of furnishing information as to who was responsible for the unsound or damaged condition of the shipment. It can be presumed that the fish were at one time sound, and whether the defendant received them from the shipper or from a connecting carrier, if a carrier delivers them in bad condition from his hands, the presumption will arise that the damage accrued while in his custody; for the reason that a carrier is not required to transport articles unfit for shipment or in bad condition, without at least being able to prove that fact. On the other hand, in most instances all that the consignee can prove is the condition of the goods at the time he received them, and the fact that they came

from the custody of the carrier. For this reason we think that the plaintiff made a prima facie case when he proved that the goods had been in possession of the defendant as a carrier from May 4 to May 14, and, when delivered by the carrier, were worthless. It then became the duty of the carrier to show that the goods were in bad condition when delivered to him; and upon failure of such proof, the presumption that they would not have been received by him except in proper condition to be shipped is not rebutted, and the carrier becomes liable for the damage. We are aware that this rule imposes a burden upon the carrier for hidden defects in some cases, but the carrier will still be protected by the rule which relieves from liability where the injury or destruction of the shipment is caused by the act of the shipper, or by violation by the shipper of reasonable rules made by the carrier, or where there is a fraudulent concealment of the nature or value of the goods, or where the shipper dissuades the carrier from inquiry and thereby misleads the carrier as to the nature and value of the shipment, or where the goods are insufficiently packed, if the defect is not known to the carrier and the carrier is without fault.

The Supreme Court in the case of *Breed* v. *Mitchell,* 48 *Ga.* 536, fully justifies our holding in this case. Judge McCay, delivering the opinion for the court, says: "Whatever may be the rule as to the presumption of the condition in which goods are received, it is certainly true that the carrier will be presumed to have received the goods in good order for shipping, that is, that they were in such condition that they could be moved without loss. A carrier is not bound to receive goods which can not be moved without loss. A man may have a right to compel a carrier to ship damaged goods, but he can not compel him to ship goods that are so badly packed as that they can not be transported. At any rate, it is but a fair presumption that when the carrier got the goods they were in such a condition as that they were capable of being transported." And upon the same principle we hold that if a carrier can be compelled to ship damaged goods, it is his duty to know it. He is best prepared to prove it, and it is so out of the ordinary rule of business transactions that, in the absence of proof that he did receive the goods in damaged condition, it is fair to presume that he received them as in good condition, if not actually in good condition.

It is in evidence in this case that the goods were actually received from a connecting carrier, the Western Railroad of Alabama, and carried in the same car to Atlanta, by the defendant; and as said by the Supreme Court, in *Paramore* v. *W. R. Co.,* 53 *Ga.* 386, "if the carrier who receives them finds that they are not in good order,—that damage has already occurred,—he can protect himself. It might be his duty to receive them in such order and to deliver them,—that is, he may be compelled to receive even damaged goods,—but he is not bound to receive them when they are so badly packed that they can not be received without loss: *Breed* v. *Mitchell,* 48 *Ga.* 533. So the defendant was not bound to receive these cars from the Atlanta & West Point Railroad with the hogs so crowded that they were in danger from suffocation. If it did, it made the act of that road its own act and was bound for the damages resulting from it. And *the burden is on it to show whether the suffocation occurred before or after its receipt of such cars."* In this case the car containing the goods was received by the Atlanta & West Point Railroad Company from the Western Railroad of Alabama instead of being received by the Western Railroad of Alabama from the Atlanta & West Point Railroad Company as in the *Paramore* case, and the shipment is fish, whereas hogs were being carried in the case cited; but the rule must be the same. The goods in each case were destroyed, so far as practical use was concerned, and the burden is on the carrier delivering the goods to show whether the injury occurred before or after its receipt of the shipment. It is true that the action in the *Paramore* case was based on § 2084 of the code, but that fact would not vary the sound reasoning upon which the presumption of receipt in good order is based. The court further proceeds to say, that if the goods be in bad order or damaged, any road can so specify in its receipt and be protected; and that if a carrier can protect himself against liability for the receipt of goods in bad order—in an unmerchantable condition—"at least the burden is on him of showing that it was not by his default or his own negligence . . that the injury was caused."

While this action, so far as recovery is concerned (plaintiff having abandoned the first count), is not based upon § 2298, still, as a matter of fact, it appears from the receipt offered by the defendant that the goods were delivered in good order by the Louis-

ville & Nashville Railroad Company to the Western Railroad of
Alabama, and that road, without change of cars, delivered the
goods to the defendant company. So that if we consider the
goods in the light of the receipt, they must be presumed to have
been in good order when received by the defendant, and the bur-
den is shifted to the defendant to show the contrary. Further-
more, the bill of lading issued by the initial carrier, the steamboat
company, is in evidence, and recites that the goods were received
in good order. And in *Bell* v. *W. & A. R. Co.,* 125 *Ga.* 512, 54
S. E. 532 (a case based upon the common-law liability of the
carrier), it is held that "the bill of lading issued by the initial
carrier plays an important part in the plaintiff's case, whether the
plaintiff relies upon the count  .  .  growing out of the breach of
duty arising under the contract, or on the count charging liability
on the part of the defendant under the Civil Code, § 2298, as being
the last connecting carrier who received the goods as 'in good order.'
In the first instance, though the consignee be not a party to a con-
tract of carriage between a railroad company and a shipper, the
consignee may make proof of such contract with a view to show-
ing that the company became liable to him for a failure to comply
with its legal duty as a common carrier." And in the same case
(p. 513) it is held, that "when a connecting carrier who has com-
pleted the transportation and delivered the goods to the consignee
in a damaged condition is sued for the loss in value, upon proof
that the initial carrier received the shipment in good order, the
jury have the right to infer that they continued in that condition
down to the time of their delivery to the carrier making the delivery
to the consignee, and that the injury or loss occurred while in his
possession.  .  .. If nothing more had appeared than that the con-
signor delivered the cabbages to the initial road in good order, the
plaintiff would have shifted the burden on the defendant com-
pany of showing that it was not responsible for the damaged con-
dition  .  .  when delivered."

The cases of *Henry* v. *Central R. Co.,* 89 *Ga.* 815, 15 S. E. 757,
and *W. & A. R. Co.* v. *Exposition Mills,* 81 *Ga.* 529, 7 S. E. 916,
2 L. R. A. 102, sustain our holding, that where a railroad com-
pany is sued on its common-law liability for damages to goods
delivered by it in a damaged condition, the presumption arises
that it received the freight in good order; and that this presump-

tion must be rebutted by proof. In *Henry's* case, cited above, it is held that where it does not appear either that the carrier received the goods as in bad order or that they were in fact in bad order when received, the presumption is that they were in good order. Hutchinson on Carriers (3d ed.), § 1348, is authority for the proposition that the bill of lading issued by the initial carrier is competent evidence to establish the condition of goods at the time of their delivery to such carrier, and that where goods are received as in good order by the initial carrier, the presumption is that the goods remained in the same good condition when they came into the possession of the carrier sued. Section 2298 of the Civil Code has reference only to railroads, and consequently the bill of lading issued in this case by the steamboat company would not have been competent evidence had the count for the statutory remedy been relied on; but as only the count based on the common-law liability of the defendant was insisted upon, the bill of lading issued by the steamboat company, the initial *carrier,* was properly admitted. Its contents established the fact that the goods were delivered by the consignor in good order, and certainly, in connection with the other evidence in the case, raised the presumption that the defendant, the Atlanta & West Point Railroad Company, received them in good order. This presumption, unless rebutted, entitled the plaintiff to a recovery; and consequently it was error to direct a verdict for an amount so small that it amounted to a verdict for the defendant. *Judgment reversed.*