**UNIROYAL, INC., Plaintiff-Appellant,**

v.

**George K. HOOD et al., Defendants-Third Party Plaintiffs-Appellees,**

**USCO Services, Inc., Third Party Defendant.**

**No. 76–2997.**

United States Court of Appeals, Fifth Circuit.

Jan. 25, 1979.

Edward W. Killorin, David M. Brown, Law Offices of Killorin & Schroder, Atlanta, Ga., for plaintiff-appellant.

Hugh E. Wright, W. Lyman Dillon, Philip S. Coe, Atlanta, Ga., for George K. Hood, William B. Hood, & James B. Hood.

Sidney F. Wheeler, John M. Hudgins, IV, Ben S. Williams, Atlanta, Ga., for Sam Hodges Co.

Before WISDOM, AINSWORTH and CLARK, Circuit Judges.

AINSWORTH, Circuit Judge:

In this Georgia diversity case, Uniroyal, Inc., a New Jersey corporation with its principal place of business in Connecticut, appeals from a judgment denying recovery from Hood Brothers, a Georgia partnership, and Sam Hodges Company, a Georgia corporation, for damage to shoes stored in a warehouse owned by Hood Brothers and leased to Uniroyal. The damage occurred, consequent to a severe storm, when rainwater flowed into the warehouse after running off an adjacent construction site, also owned by Hood Brothers, upon which Sam Hodges Company, a general contractor, was constructing additional warehouse space. The district court entered judgment in favor of Hood Brothers upon a directed verdict and in favor of Sam Hodges Company upon a jury verdict in response to a special interrogatory. We affirm as to both defendants.

## I.

In 1968, Hood Brothers purchased a tract of land in Forest Park, Georgia, near the Atlanta airport. At the time of purchase, a warehouse was located on the western portion of the tract. The warehouse had been occupied since 1961 by Uniroyal pursuant to a long term lease. The original lessors assigned the lease to Hood Brothers as part of the purchase. Uniroyal has used the warehouse for storage of shoes, sandals, and other merchandise. USCO Services, Inc. has operated the warehouse for Uniroyal.

In October of 1972, Hood Brothers agreed with Uniroyal to construct and lease to it an addition to the existing warehouse to be situated on the vacant eastern portion of the tract. On October 1, 1972, Hood Brothers and Uniroyal executed a written lease covering the proposed new addition, to become effective one month following the completion of construction. On November 17, 1972, Hood Brothers, as owner, and Sam Hodges Company, as general contractor, signed a construction contract for the new warehouse facility. Previously, USCO Services and Uniroyal had supplied specifications for the project to Sam Hodges Company, thereby inviting submission of a bid for the construction contract. Subsequently, Hood Brothers selected Sam Hodges Company from a list of four contractors submitting bids.

Sam Hodges Company began construction of the new warehouse in the last week of November of 1972 with the grading and leveling of the vacant lot. Subsequently, during the three-month period from February to April of 1973, two concrete floor slabs, measuring approximately 225,000 square feet, were poured. A 4-foot gap, 6 to 8 inches deep, running north and south, separated the two slabs from the east wall of the existing warehouse. The gap was intended to accommodate either footings

for a firewall or pillars. It also served as a drainage ditch protecting the existing warehouse from water running off the concrete floor slabs. Another similar gap or ditch, approximately 16 feet wide, ran east and west, separating the two floor slabs and intersecting the other to form a T.

Prior to the commencement of construction, the vacant lot was generally sloped from northeast down to southwest. A ditch capable of carrying accumulated surface water ran across the lot from north to south. With the leveling and grading of the site and the pouring of the concrete floor slabs, the flow of surface water on the site was altered. The presence of the concrete slabs caused a general increase in flow due to the elimination of absorption into the earth. Furthermore, the direction of the flow was altered by the configuration of the slabs. Evidently the portion of the slabs closest to the existing warehouse sloped gradually from east to west, with a total drop, imperceptible to the naked eye, of about 2¾ inches. The slope was necessary in order to bring the floor of the new addition flush with that of the existing warehouse. The sloped portion constituted, approximately, the western one-fifth of the total floor area. The remaining floor area was flat. Surface water flowed off the flat part of the slabs in all directions and off the sloped part in an east to west direction into the 4-foot ditch or gap separating the slabs from the existing warehouse. Preformed concrete walls, poured during late April and early May of 1973, lay flat on the slabs, prior to being tilted up into position. These walls diverted further surface water in a westward direction toward the existing warehouse. In sum, essentially uncontradicted testimony indicates that by mid-May of 1973, the slope of the slabs and the presence of the preformed walls, compounded by the nonabsorbent character of concrete, had altered the natural flow of surface water on the construction site in such a way that greater quantities flowed in a westward direction toward the eastern wall of the existing warehouse.

One of the doors located on the east wall of the existing warehouse was a fire door beneath which there was an opening of about 1 inch. Testimony indicates that both Sam Hodges Company and USCO Services knew of this opening but that Hood Brothers did not. Through that opening, on the weekend of May 19–20, 1973, rainwater entered the warehouse after collecting in and overflowing the 4-foot gap or ditch between the warehouse and the concrete floor slabs. According to the testimony of a USCO employee, the water accumulated to a depth of almost 7 inches, primarily in the southeast portion of the warehouse where cardboard boxes containing shoes and sandals were stacked on the floor. The flooding allegedly damaged 62,410 pairs of footwear.

Meteorological data recorded at the Atlanta airport, nearby the construction site, indicate that 2.6 inches of rain fell between 9 a. m. on May 19 and 6 a. m. on May 20. Of that total, approximately 2.1 inches fell in the nine-hour period from 9 p. m. on May 19 to 6 a. m. on May 20. In addition, gusts of wind reached 42 m. p. h., the highest velocity recorded in the first five months of 1973. The meteorological evidence indicates that several rainstorms of comparable severity in precipitation occurred in the first five months of 1973 (one in January, with almost 4 inches falling in a 19-hour period and 3 inches in a 5-hour period; one in February; two in March; one in April; and one in May, subsequent to the storm of May 19–20). No flooding of the warehouse resulted from any storm except that of May 19–20.

The evidence indicates that the flooding occurred because an obstruction in the 4-foot gap or ditch separating the concrete floor slabs from the warehouse prevented accumulated surface water from flowing off the site. The testimony as to the nature of the obstruction was conflicting. The warehouse manager, a USCO Services employee, testified that the ditch was dammed up by dirt. Two Sam Hodges Company

employees, the building superintendent and the project manager, testified that the flow of water in the ditch was impeded by construction material and debris either blown or washed into the ditch during the storm. Both testified that the wind was strong enough to blow a lamp stand weighing over 100 pounds across the slab.

In the aftermath of the flooding, Uniroyal sued both Hood Brothers, the property owner (and Uniroyal's landlord), and Sam Hodges Company, the contractor. Uniroyal primarily contended that Sam Hodges Company and, derivatively, Hood Brothers were liable for damage caused to Uniroyal's goods on account of having negligently altered the flow of surface water on the construction site so that it entered the warehouse. Uniroyal also attempted to support its claim against Sam Hodges Company on theories of trespass and nuisance. In addition, Uniroyal sought recovery from Hood Brothers, as owner and lessor of the warehouse and the construction site, under various theories of tort, contract, and property law, without regard to liability on the part of Sam Hodges Company. Both Hood Brothers and Sam Hodges Company filed a third party claim against USCO Services, Inc., the warehouse operator, seeking contribution or indemnity should either defendant be held liable to Uniroyal.

At the close of all the evidence, the trial judge granted Hood Brothers' motion for a directed verdict and, as a result, also granted USCO Services' motion for a directed verdict in regard to Hood Brothers' third party complaint. In addition, on defendant Sam Hodges Company's motion, the court refused to present Uniroyal's trespass and nuisance theories to the jury. As a result, the judge submitted to the jury only the claim of negligence on the part of Sam Hodges Company and the complementary third party claim by Sam Hodges against USCO Services. The court outlined Uniroyal's allegations of negligence and instructed the jury on the general law of negligence and on the defendant's affirmative defense of an act of God.

The court submitted eight special interrogatories to the jury. The first interrogatory asked: "Were the damages in this case caused by an act of God?" If the answer to that question was "no," the jury was instructed to continue and answer the remaining interrogatories. In fact, however, the jury answered the first question in the affirmative, concluding that the damages were indeed caused by an act of God. Consequently, the court entered judgment in favor of Hood Brothers and Sam Hodges Company from which Uniroyal has appealed.

We deal first with Uniroyal's contentions relating to its claim against the contractor, Sam Hodges Company. Then we treat Uniroyal's objections to the directed verdict in favor of the property owner, Hood Brothers.

II.

Uniroyal's principal objections to the disposition of its claim against Sam Hodges Company center on the act of God defense, which was the basis of the jury verdict in response to the first special interrogatory. Uniroyal argues that the facts of this case cannot support an act of God defense and that the court therefore should not have instructed the jury on it. Furthermore, Uniroyal argues that the instruction was in any event erroneous and that the court improperly emphasized the act of God defense by presenting it to the jury in the first special interrogatory as a threshold question which might (and indeed did) prove dispositive of the entire claim. In addition, Uniroyal objects to the court's refusal to instruct the jury on the specific duty of the contractor to refrain from altering the flow of surface water so as to cause damage to an adjoining lot.[1] Finally, Uni-

1. Uniroyal also objects to one clause in the court's lengthy instructions in which the judge explained that the plaintiff had the burden of proving by a preponderance of the evidence

royal contends that the court erroneously refused to instruct the jury on its trespass and nuisance theories.

■ Under Georgia substantive law, which is applicable in this federal diversity action, an act of God, from which no tort liability can arise, is an accident caused by physical causes which are irresistible or inevitable, such as lightning, storms, perils of the sea, earthquakes, inundations, sudden death or illness. Ga.Code Ann. § 102–103 (1968). The term applies only to those events in nature which are so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them. *Sampson v. General Electric Supply Corp.*, 78 Ga.App. 2, 50 S.E.2d 169 (1948). A catastrophe arising from the force of the elements which human intelligence cannot predict nor the ingenuity of man foretell is an act of God. *Western & Atlantic R. R. v. Hassler*, 92 Ga.App. 278, 88 S.E.2d 559 (1955). Furthermore, the concept of act of God excludes all idea of human agency. Ga.Code Ann. § 102–103 (1968). Thus, an act of God is a casualty not due to nor contributed to by human agency, *Ohlen v. Atlanta & West Point Railroad Company*, 2 Ga.App. 323, 58 S.E. 511 (1907), and a casualty preventable by the exercise of ordinary care is not an act of God. *Central Georgia Electric Corp. v. Heath*, 60 Ga.App. 649, 4 S.E.2d 700 (1939).

■ Whether a particular casualty is an act of God is a mixed question of law and fact. "The defining and limitation of the term, its several characteristics, its possibilities as establishing and controlling exemption from liability, are questions of law for the court; but the existence or non-existence of the facts on which it is predicated is a question for the jury." *Goble v. Louisville & Nashville Railroad Company*, 187 Ga. 243, 200 S.E. 259, 264 (1938). Thus, the court must define, as a matter of

law, the legal concept of an act of God and instruct the jury as to the legal elements and effects of the defense. It is then the responsibility of the jury to determine whether the facts of the case at hand fulfill the legal criteria for recognition of the defense. Specifically, it is for the jury to determine, as a matter of fact, whether the casualty resulted from an irresistible and unforeseeable natural event to which human agency did not contribute. See, e. g., *Tek-Aid, Inc. v. Eisenberg*, 137 Ga.App. 99, 223 S.E.2d 29 (1975); *Joyce v. City of Dayton*, 73 Ga.App. 209, 36 S.E.2d 104 (1945).

■ In this case, Uniroyal contends that there was insufficient evidence to support the submission to the jury of the act of God defense. Specifically, Uniroyal argues that there was not substantial evidence (as required to create a jury question, *see Boeing Company v. Shipman*, 5 Cir., 1969, 411 F.2d 365, 374–75) from which a jury could have concluded that the storm of May 19–20 was so extraordinary and unforeseeable as to constitute an act of God and that human agency in no way contributed to the casualty.

In regard to the nature of the storm, we have no difficulty finding substantial evidence of extraordinary and unforeseeable climatic conditions in the Atlanta area over the weekend of May 19–20. In addition to the heavy rainfall, gusts of wind up to 42 m. p. h. were recorded near the construction site at the Atlanta airport. No wind of greater velocity was recorded in the first five months of 1973. Moreover, two witnesses testified that the wind was strong enough to topple a lamp stand weighing over 100 pounds and blow it across the concrete slab.

Although Uniroyal in its brief discusses only the matter of rainfall, the additional wind factor, in combination with the rain, is the critical element. The warehouse flood-

that "all material claims made in the suit are true." Without further discussion, we note that this objection is without merit. Even if we accept, arguendo, that those few words were

indeed ill-chosen, we nevertheless cannot find them confusing, misleading, or prejudicial in the context of the entire charge.

ed not simply because it rained, but because the accumulated rainwater overflowed the drainage ditch between the warehouse and the concrete slabs. Two witnesses testified that the ditch was clogged, and drainage obstructed, by construction material blown into it during the storm. Thus, the record supports the conclusion that the flooding resulted from the combination of wind and rain and not from the rain alone. Therefore, even though the precipitation alone may not have been extraordinary, we have no trouble upholding the submission of the act of God question to the jury in light of the additional wind factor and the effect tnereof.

In regard to the question of contributing human agency, we find substantial evidence to support the jury's evident conclusion that human agency, as that legal term must be defined in this context, played no role in the casualty. We reject Uniroyal's argument that various physical characteristics of the warehouse and the adjacent construction site were the product of human agency and contributed to the casualty, thereby requiring rejection of the act of God defense. The slope of the construction site, the impermeability of the concrete slabs, the presence on the slabs of the preformed concrete walls and other construction material, and the opening under the warehouse door were all the product of human effort; and each of those conditions, we may assume, contributed in some part to the casualty. It does not follow, however, that the mere existence of such conditions compels a conclusion that human agency contributed to the casualty in the legal sense with which we are concerned. If the party responsible for the conditions in question was not at fault in allowing them to exist, then his conduct is not the type of contributory human agency which in these circumstances makes unavailable the act of God defense. Disallowance of the act of God defense would be appropriate here only if the conditions which facilitated the casualty were the result of continuing tortious malfeasance.

In this case, the record contains substantial evidence from which the jury could have concluded, as it apparently did, that the casualty occurred without any negligence on the part of Sam Hodges Company or any other party. Substantial evidence supports the hypothesis that high winds blew construction material into the otherwise adequate drainage ditch, causing accumulated rainwater to overflow and invade the warehouse. In that regard, no human agency contributed to the casualty in the legal sense with which we are concerned in this case. Submission to the jury of the act of God defense was, therefore, appropriate in the circumstances of this case.[2]

■ In submitting the act of God defense to the jury, the trial judge fully and accurately instructed the jury as to the elements of the defense, the defendant's burden of proof, and the competing contentions of the opposing parties. We find no merit in Uniroyal's contention that the judge unfairly presented its case by failing to mention in specific connection with the act of God defense the numerous acts of human agency which, according to Uniroyal, contributed to the casualty. The trial judge mentioned those acts earlier in his charge when he outlined in considerable detail the overall contentions of the plaintiff. In relation to the subsequent instructions on the act of God defense, it was sufficient that the court

2. *See Tek-Aid, Inc. v. Eisenberg*, 137 Ga.App. 99, 223 S.E.2d 29 (1975). In *Tek-Aid*, in a situation quite similar to that involved here, a Georgia court of appeals stated:

  Also it was a jury question whether the proximate cause of the accumulation of water on the roof was inadequate drains or the severe wind and rainstorm which deposited leaves and debris on the roof and which clogged the drain; and, if the latter, it was a question for the jury as to whether the storm which occurred on the occasion under investigation and which resulted in the roof drain being clogged with debris of tree leaves and small branches was an act of God, relieving the landlord of liability.

  *Id.* at 100, 223 S.E.2d at 30.

mentioned Uniroyal's most significant contention: that Sam Hodges Company negligently allowed dirt and other materials to dam up the drainage ditch. As discussed above, the other supposed acts of human agency were not in themselves sufficient to undermine the act of God defense. The judge's focus on the damming of the drainage ditch was thus reasonable and helpful to the jury.

The trial judge also acted properly and logically in presenting the act of God issue to the jury in the first special interrogatory. The fact that the jury's answer to that interrogatory proved dispositive of Uniroyal's claim was the unavoidable result of the nature of the issue. The court carefully instructed the jury that it could not consider the casualty an act of God if it was caused, in whole or in part, by the defendant's negligence or, using different language, if it could have been prevented by the exercise of ordinary care. The conclusion. that Sam Hodges Company had not acted negligently was thus inherent in the conclusion that the casualty was caused by an act of God. The jury plainly needed to go no further to dispense with Uniroyal's negligence claim. Thus, the special interrogatory concerning the act of God defense adequately and fairly presented the contested issue of the defendant's negligence to the jury.[3]

We also reject Uniroyal's contention that the court erred in not instructing the jury that the contractor had a specific duty under Georgia law to refrain from diverting the flow of surface water and causing damage to adjoining property. Georgia law does not impose strict liability on any party for damage caused by surface water runoff. Liability must be based upon some element of intentional or negligent conduct which proximately causes the water damage. See *Brand v. Montega Corp.*, 233 Ga. 32, 209 S.E.2d 581 (1974). In that regard, several Georgia cases cited by Uniroyal hold that a landowner (or an independent contractor) has no right incidental to ownership (or control) of property to cause surface water to flow on to a lower estate differently than gravity would normally dictate. *First Kingston Corp. v. Thompson*, 223 Ga. 6, 152 S.E.2d 837 (1967); *Gill v. First Christian Church*, 216 Ga. 454, 117 S.E.2d 164 (1960); *Southern Mutual Investment Corp. v. Langston*, 128 Ga.App. 671, 197 S.E.2d 775 (1973). If applicable in this context involving adjoining lots under common ownership, that rule of law serves only to limit the assertion of property rights; it creates no new duty beyond the ever-present responsibility to exercise reasonable care in all matters. Its clear import is that in a case involving surface water runoff the responsible party can claim no right founded in property law which can displace standard principles of tort liability. In this case, the court left no doubt in its instructions to the jury that Sam Hodges Company should be liable for any damage proximately caused by its negligence. Georgia law requires no more.

Finally, we reject Uniroyal's contention that the trial court acted erroneously in refusing to instruct the jury on plaintiff's nuisance and trespass theories.

In regard to the nuisance theory, under Georgia law a single, isolated occurrence cannot constitute a nuisance. "The whole idea of nuisance is that of either a continuous or regularly repetitious act or condition which causes the hurt, inconven-

---

**3.** At best, Uniroyal can argue that the court could have more directly presented the negligence issue if it had given merely a simple negligence charge without mention of the act of God defense and without use of a special interrogatory relating to it. While such a charge may have been sufficient, we cannot properly say that the court erred in giving more pointed attention to the act of God question. The defendant was entitled, as a matter of Georgia law, to an instruction on the affirmative de-

fense of act of God, whether or not one might consider that instruction superfluous and a simple negligence instruction sufficient. In any event, it bears remarking, as the court instructed the jury, that the defendant bore the burden of proof in establishing the affirmative defense. It is difficult to see how Uniroyal could have been prejudiced by an instruction and an interrogatory which, as a threshold matter, effectively transferred the burden of proof on the critical negligence issue to the defendant.

ience or injury." *Southeastern Liquid Fertilizer Co. v. Chapman*, 103 Ga.App. 773, 775, 120 S.E.2d 651 (1961). *See also City of Atlanta v. Roberts*, 133 Ga.App. 585, 211 S.E.2d 615 (1974). In this case, the evidence conclusively reveals that water entered the warehouse on only one occasion despite a record of persistent rain over a five-month period. Clearly, therefore, the construction site ·was not continuously maintained in a condition creating a nuisance causing damage to the plaintiff, and, as a matter of law, Uniroyal could not have recovered under a nuisance theory.

In regard to the trespass theory, Uniroyal clearly contended, as revealed in a colloquy between the court and plaintiff's counsel, that the flooding constituted an intentional trespass. Reliance on a theory of negligent trespass would have added nothing to the plaintiff's general allegation of negligence which the court submitted to the jury. There was not substantial evidence, however, from which a jury could have concluded that Sam Hodges intentionally caused the flooding of Uniroyal's warehouse. Thus, the court properly refused to instruct the jury on Uniroyal's trespass theory.

To summarize, in respect to Uniroyal's claim against Sam Hodges Company, the court properly submitted the act of God defense to the jury under adequate instructions. The jury verdict, in response to the first special interrogatory, is supported by substantial evidence. It effectively and fairly disposes of Uniroyal's negligence claim. Additionally, the court properly dismissed Uniroyal's nuisance and trespass claims. Hence, the judgment in favor of Sam Hodges Company must be affirmed.

### III.

In respect to its claim against Hood Brothers, the owner of the entire property encompassing both the existing warehouse and the construction site, Uniroyal contends on appeal that the trial court erred in directing a verdict in favor of the defendant. In support of that contention, Uniroyal proposes several theories of liability, discussed individually below, upon which a jury verdict in its favor might have been based. We conclude, however, in agreement with the district court, that no substantial evidence appears in the record on the basis of which a jury could have found Hood Brothers liable under any theory.

Uniroyal's contentions may be fairly condensed into five suggested theories of liability. First, Uniroyal argues that Hood Brothers is responsible under Georgia landlord-tenant law, as owner and lessor of the existing warehouse, for damage suffered by Uniroyal as a result of the opening under the warehouse door which permitted surface water to enter the building. Second, Uniroyal contends that Hood Brothers is liable on the basis of contractual obligations imposed by the agreement of October 1972 for construction and subsequent leasing of the new warehouse facilities. Third, Uniroyal argues that Hood Brothers was negligent in employing an incompetent contractor. Fourth, Uniroyal argues that Hood Brothers is vicariously liable for negligence on the part of the contractor, Sam Hodges Company. Fifth, and finally, Uniroyal proposes that Hood Brothers was itself negligent in allowing the construction site to be maintained in a manner permitting the flooding of the adjacent warehouse. We dispense, seriatim, with each of those contentions.

In 1968, concurrent with its purchase of the property involved in this case, Hood Brothers assumed the 1961 lease between the seller and Uniroyal. The lease was for a 25-year term, with option to renew. It governed the landlord-tenant relationship between Uniroyal and Hood Brothers in May of 1973 at the time of the flooding which precipitated this litigation. No language in the lease agreement can be construed to impose an obligation on Hood Brothers to seal the opening under the warehouse door through which water entered on the weekend of May 19–20, 1973. Furthermore, and contrary to Uniroyal's contention, no rule of Georgia law imposes such an obligation in the absence of contractual agreement.

We reject Uniroyal's argument that the opening under the door constituted a structural defect (or, to use more appropriate terminology, a defect in original construction) for which Hood Brothers, the landlord, was responsible if it actually knew of the defect or by due diligence could have discovered it. First, we doubt that, as a matter of law, the opening under the door could qualify as a defect in original construction or, for that matter, as a defect at all.[4] In any event, assuming that the opening was indeed a defect in original construction, the landlord was not responsible for it under Georgia law in the circumstances of this case. Where, as here, a structure has been built by a predecessor in title of the landlord, the landlord can be held responsible to his tenant for a defect in original construction only if he knew or by the exercise of reasonable care should have known of the defect *before the tenancy was created*. *National Distributing Co. v. Georgia Industrial Realty Co.*, 106 Ga.App. 475, 127 S.E.2d 303 (1962); *Sutton v. Murray*, 49 Ga.App. 130, 174 S.E. 174 (1934). In this case, it is undisputed that Uniroyal's tenancy was created in 1961 and that Hood Brothers did not know and could not have known of the opening under the door at that time. Uncontradicted testimony at trial indicates that Hood Brothers was not aware of the opening before the events of May 1973 and was not even aware of the warehouse's existence until 1966 or 1967. Thus, we find no basis in Georgia law for holding Hood Brothers liable, as owner and lessor of the existing warehouse, on account of the opening under the door.

In an agreement of October 1, 1972, Hood Brothers agreed to erect additional warehouse space for Uniroyal "in accordance with the plans and specifications captioned Exhibit C and which plans and specifications have been initialed by the parties hereto and are by reference hereby made a part of this lease agreement." Those specifications provided, inter alia, that all ditches be kept free of accumulated water, that construction debris be removed from the site on a daily basis, and that necessary precautions be taken to secure adjoining structures from damage. Uniroyal now argues, in essence, that Hood Brothers guaranteed compliance with those specifications, thereby leaving itself liable as a matter of contract law for any lack of compliance occurring during the construction process. We disagree.

The clear purpose of the agreement to build in accordance with the initialed specifications was to assure that Uniroyal ended up with the warehouse space for which it bargained. The agreement does not constitute substantial evidence of an intent on the part of Hood Brothers to guarantee an independent contractor's strict, day-to-day compliance with detailed construction procedures. To view it as such, we would have to assume that Hood Brothers intended to bargain away a great part of the protection afforded an employer under Georgia law from liability for the collateral torts of an independent contractor. *See* Ga.Code Ann. § 105–501.[5] Without a more definite expression of intent such an assumption is patently unreasonable. Hence, we find no basis in the lease agreement of October 1972 for imposing liability on Hood Brothers in this case.

---

4. We find no inconsistency between Hood Brothers' contention that the opening under the door did not constitute a defect and Sam Hodges Company's third party complaint against USCO Services, the warehouseman. A jury might have properly found USCO Services, with its supposed expertise in the storage field, negligent in storing goods on the warehouse floor within the reach of surface water invasion and in failing to seal the door in question. Such findings, however, would not have affected the entirely separate issue of whether the gap under the door constituted some form of a defect, as a matter of property law, for which Hood Brothers, the landlord, was responsible.

5. An employer may be liable for the collateral torts of an independent contractor under an exception to the general rule of nonliability when "the wrongful act is the violation of a duty imposed *by express contract* upon the employer." Ga.Code Ann. § 105–502(3). This exception, and the general question of an employer's vicarious liability, are discussed further below.

Uniroyal's contention that Hood Brothers was negligent in employing an incompetent contractor is totally unsupported by the record. No evidence indicates that Hood Brothers had any reason to question Sam Hodges Company's competence at the time its bid was submitted and accepted or at any other time prior to the weekend of May 19–20. Indeed, the record reveals that Uniroyal itself solicited the bid from Sam Hodges and that USCO Services employed Sam Hodges Company in 1974, well after the flooding of May 1973, to repair tornado damage to the roof of the old warehouse. At best, Uniroyal produced sufficient evidence to create a jury question regarding Sam Hodges Company's negligence in this case. Such evidence is not sufficient, however, to support a determination that Sam Hodges was from the start incompetent for the job or that Hood Brothers acted negligently in failing to select a competent contractor.

As mentioned above, under Georgia law an employer is generally not responsible for torts committed by an independent contractor. Ga.Code Ann. § 105–501. In that regard, an independent contractor is an employee who exercises an independent business in which it is not subject to the immediate direction and control of the employer. *Id.* The employer is liable, however, for the negligence of an independent contractor in six specific situations which stand as exceptions to the general rule: 1) when the work is wrongful in itself, or, if done in the ordinary manner, would result in a nuisance; 2) when the work to be done is in its nature dangerous to others, however carefully performed; 3) when the wrongful act is the violation of a duty imposed by express contract upon the employer; 4) when the wrongful act is the violation of a duty imposed by statute; 5) when the employer retains the right to direct or control the time and manner of executing the work, or interferes and assumes control, so as to create the relation of master and servant, or so that an injury results which is traceable to his interference; and 6) when the employer ratifies the wrong of the independent contractor. Ga.Code Ann. § 105–502.

In this case, Sam Hodges Company is clearly an independent contractor. Hence, Hood Brothers is not, as a matter of Georgia law, liable for any tort committed by Sam Hodges Company, unless the record contains evidence to bring the case within one of the six exceptions to the general rule of the employer's nonliability. We conclude that the record contains no such evidence.

Plainly, the record contains no evidence from which a jury might have concluded that this ordinary construction project was in itself wrongful, so as to constitute a nuisance if done in the ordinary manner, or was in its nature dangerous to others, however carefully performed. Similarly, there is no evidence that Hood Brothers in any way ratified the alleged negligence of Sam Hodges Company or in any way retained control over the construction process or interfered in that process so as to create a master-servant relationship or so as to cause any injury traceable to the interference.

We concluded above that the lease agreement of October 1972 may not be construed to require Hood Brothers to guarantee compliance by Sam Hodges Company with the work rules outlined in the specifications for the project. The record contains no other evidence of violation of duty imposed by express contract upon Hood Brothers.

Finally, Uniroyal can point to no duty imposed upon Hood Brothers by statute which has been violated. At oral argument, Uniroyal claimed that a Georgia statute regarding ownership of running water imposed a duty on Hood Brothers as a property owner to prevent surface water runoff from damaging adjoining property. The statute in question, however, deals not with surface water but with "running water." Ga.Code Ann. § 85–1301. Because Georgia law imposes liability on an employer for the torts of an independent contractor only when a duty imposed *by statute* has been violated, Uniroyal cannot advance its theory of vicarious liability by citing cases establishing, *as a matter of common law*, that a property owner has no right to cause sur-

face water to run off his land and cause damage to the property of a lower proprietor, *see, e. g., Gill v. First Christian Church*, 216 Ga. 454, 117 S.E.2d 164 (1960). Furthermore, as discussed briefly above and further below, we cannot fairly construe these cases as imposing any new duty on a property owner and certainly not as imposing a duty which may not in the ordinary course of events be delegated to an independent contractor.

In sum, therefore, in light of the record below and the requirements of Georgia law, a jury could not have found Hood Brothers liable for any tort committed by its independent contractor, Sam Hodges Company, under any of the exceptions to the general rule of an employer's nonliability.

■ Uniroyal's final contention is that Hood Brothers was liable for negligence of its own in failing to take action to prevent the flooding of the warehouse. In support of that contention, Uniroyal cites testimony to the effect that each of the Hood Brothers partners occasionally visited the construction site and was aware of the progress of construction, its effect on surface water flow, and the existence of the drainage ditch along the wall of the existing warehouse. Such evidence, however, of occasional visits to observe construction progress, without more, is insufficient to support a jury determination that Hood Brothers knew or should have known of any danger of flooding the existing warehouse.

Uniroyal attempts to avoid that problem by arguing that under Georgia law a property owner has a nondelegable duty to prevent any alteration in the flow of surface water which would cause damage to adjoining property. If that were indeed the case, then Hood Brothers could be liable for the wrongful acts of Sam Hodges Company, regardless of whether it was aware of them or should have been aware of them. Such a

result, of course, would nullify the Georgia statute protecting an employer from liability for the torts of an independent contractor except in specified, carefully limited situations. We do not, however, interpret Georgia law to work at such cross-purposes. As pointed out above, the Georgia cases dealing with surface water runoff cited by Uniroyal [6] impose no strict vicarious liability or nondelegable duty on a property owner. They merely establish, as a matter of property law, that a landowner has no right incident to his ownership of land to divert surface water runoff so as to damage an adjoining proprietor. They do not impose upon a landlord any form of strict liability to his tenant. Indeed, they do not even speak to the landlord-tenant relationship, but instead to the relations between adjoining proprietors.

In sum, we do not find in the cases cited by Uniroyal any novel principle of tort law or landlord-tenant law which permits imposition of liability on a property owner for the wrongful act of an independent contractor during the construction process. Given the uncontradicted evidence of the contractor's complete control over the construction process and the minimal involvement of the property owner (occasional visits to the site to observe progress), we cannot under Georgia law find any basis for imposing liability on Hood Brothers for the damage incurred as a result of the storm of May 19–20, 1973.

Thus, to summarize, we find no basis in any of Uniroyal's proposed theories for imposing liability in this case on Hood Brothers, the property owner. The record simply does not contain sufficient evidence, in light of the governing requirements of Georgia law, from which a jury could have reasonably concluded that Hood Brothers was liable for Uniroyal's loss, either as owner of the flooded warehouse or as owner of the construction site, under any theory of tort, contract, or landlord-tenant law.

**6.** *Associated Lerner Shops of America v. Thibodeau*, 5 Cir., 1968, 396 F.2d 768; *Gill v. First Christian Church*, 216 Ga. 454, 117 S.E.2d 164 (1961); *First Kingston Corp. v. Thompson*, 223 Ga. 6, 152 S.E.2d 837 (1967). Uniroyal cites these cases in its brief in relation to its claim against Sam Hodges Company and the question, discussed above, of whether the court should have instructed the jury specifically on the claimed duty to refrain from altering the flow of surface water. In oral argument, however, Uniroyal made clear that it relied upon these cases to establish a nondelegable duty on the part of Hood Brothers, the property owner.

467

Hence, the judgment below is affirmed as to both defendants, Sam Hodges Company and Hood Brothers.

AFFIRMED.

CHARLES CLARK, Circuit Judge, specially concurring:

I concur in all of Judge Ainsworth's opinion for the majority except his conclusion that under Georgia law an assignee landlord may never be held responsible to his tenant for defects in original construction unless they are known, or should have been known, to the assignee before the original tenancy was created. Certainly the assignee should not have a superior defense to that which would be accorded the original lessor in his dealings with the lessee. *Cf. Algernon Blair, Inc. v. National Surety Corporation*, 222 Ga. 672, 151 S.E.2d 724 (1966). Yet the rule announced today would absolve any assignee who takes subsequent to construction even where the original lessor may have had full knowledge of a defect. I do not agree that Georgia has or will hold this to be the rule. However, in the absence of proof that the door in question was constructed to be watertight, I agree that the opening at its bottom would not qualify as a defect in original construction.